The Honorable Marilyn Edwards State Representative 2330 North Juneway Terrace Fayetteville, AR 72703-2915
Dear Representative Edwards:
I am writing in response to your request for my opinion on the following questions:
 1. Can a city buy a building with Hotel, Motel Restaurant funds ["hamburger tax"[1] funds] and the Advertising and Promotion ("AP") Commission administer the building? Is a lease required for such an arrangement?
 2. Can a city purchase [a building] with cash from [hamburger tax] funds for use by the AP Commission as a visitors bureau? Is a lease required for such arrangement?
 3. Can a nonprofit entity purchase property with [hamburger tax] funds for a tourist promotion facility if the Commission approves the project?
 4. Can the AP Commission contract with a nonprofit entity to purchase a building for use as a visitors bureau?
My inquiries reveal that these questions relate to a proposed effort to locate the Fayetteville Convention and Visitors Bureau and a new visitor center in a particular property on a corner of the Fayetteville Square.
RESPONSE
With respect to your first question, I believe a city could clearly buy a building using revenues realized from a hamburger tax so long as its AP commission approved doing so and it only pledged the funds as collateral for bonds issued pursuant to either the Advertising and Promotion Commission Act, A.C.A. §§ 26-75-601 through -618 (Repl. 1997 Supp. 2005), or the subchapter of the Code authorizing the issuance of tourism revenue bonds, A.C.A. §§ 14-170-201 through 214 (Repl. 1998). Although the Code would benefit by legislative clarification, I doubt a city is statutorily authorized directly to purchase a building using hamburger tax revenues even if the AP approves the purchase. I believe an AP commission could "administer" the building only to the extent that doing so would fulfill the purposes set forth at A.C.A. § 26-75-606
(Supp. 2005). The law is unclear regarding the necessity of a lease in order for an AP commission to make use of city property. A factual issue further exists as to whether "administering" the building would involve activities that might warrant entering into a lease. Given my response to your first question, I believe the answer to the first part of your second question is, in all likelihood, "no," rendering the second part of this question moot. With respect to your third question, I believe any gratuitous transfer of the funds to finance a purchase of the property by a private nonprofit corporation would be barred by Ark. Const. art. 12, § 5. I further do not believe an AP commission is statutorily authorized to enter into a contract that would entail such a transfer of funds. Accordingly, I believe the answer to your fourth question is likewise "no."
Question 1: Can a city buy a building with Hotel, Motel Restaurantfunds ["hamburger tax" funds] and the Advertising and Promotion("AP") Commission administer the building? Is a lease required for suchan arrangement?
It is unclear from your question whether the proposed transaction would involve a direct purchase of real property using hamburger tax funds or a purchase using bond revenues collateralized by hamburger tax funds. As discussed below, I believe the former course would probably be impermissible under any circumstances, whereas the latter would be permissible so long as the both the voters and the AP commission approved the transaction.
Your question raises three issues: first, whether a city is authorized to purchase a building using hamburger tax funds; secondly, whether "administering" such a building would fall within the authority of the AP Commission; and thirdly, assuming the first two questions are answered in the affirmative, whether a lease would be required to consummate such an arrangement.
With respect to the authorization to impose a hamburger tax, A.C.A. § 26-75-602(a) (Repl. 1997) provides as follows:
 Any city of the first class, city of the second class, or incorporated town may, by ordinance of the governing body thereof, levy a tax not to exceed three percent (3%) upon the gross receipts or gross proceeds identified in subsection (c) of this section.
Subsection (c) of this statute provides that this tax will be levied on the operations of hotels, motels and restaurants operating within the municipality. Subsection 26-75-604(a) (Repl. 1997) provides that the proceeds of this tax will be credited to an advertising and promotion fund created by the ordinance levying the tax. Section 26-75-605 (Supp. 2005) provides for the creation by ordinance of an advertising and promotion commission in any municipality levying a tax pursuant to the Advertising Promotion and Commission Act, A.C.A. § 26-75-601 through -618 (Repl. 1997 Supp. 2005). Section 26-75-606 (Supp. 2005) sets forth the permissible uses of funds generated by this tax. Subsection (b)(1)(B) of this statute provides:
 These revenues shall be used or pledged for the purposes authorized in this subsection only upon approval of the commission created pursuant to this subchapter.
Subsection (a)(2)(A) further provides that "t]he commission is the body that determines the use of the advertising and promotion fund."
In Ark. Op. Att'y Gen. No. 2002-239, one of my predecessors addressed the relationship between a city and its AP commission as follows:
 Although the city council has the authority to initiate the advertising and promotion tax, A.C.A. § 26-75-602, and to appoint the members of the advertising and promotion commission, A.C.A. § 26-75-605, and although the city council can express its preference regarding the use of the advertising and promotion revenues, the advertising and promotion commission must ultimately approve the use of the revenues.
 As previously indicated, the advertising and promotion commission has the ultimate authority to determine the use of the proceeds of the city's advertising and promotion tax, provided that such use is consistent with the uses and limitations stated in A.C.A. § 26-75-606. As also indicated, state law does not require that the city council approve the commission's determinations regarding the use of these tax proceeds. For these reasons, I must conclude that although the city council can express its preference concerning the use of the advertising and promotion fund, the commission must give its approval in order for the fund to be used in that manner (and the use must be a permissible one).
It would appear, then, that a city's direct purchase of a building using hamburger tax revenues, if authorized at all, would at the very least need to be approved by the AP commission.[2] The question of whether a purchase of the sort contemplated in your request would be authorized even with AP commission approval is somewhat complicated, possibly implicating the related question of whether an AP commission might itself be authorized to buy and own property in its own name in pursuit of its statutorily defined mission. I appreciate that you have inquired about a city's authority to purchase property using hamburger tax funds, not an AP commission's authority to do so. However, I consider this related question germane because, at least at first blush, it would seem logical that if the legislature has foreclosed an AP commission from purchasing real estate using tax revenues it exclusively controls, the commission could not simply authorize a city to use those funds for the same purpose. However, as discussed further below, this conclusion is far from inevitable.
With respect to the issue of whether an AP commission may itself own property, one of my predecessors offered the following analysis in the attached Ark. Op. Att'y Gen. No. 2002-243 — an opinion that has apparently prompted the Fayetteville City Attorney to question whether a proposed purchase by the commission itself using hamburger tax revenues would be permissible[3]:
 None of these expressly-stated grants of authority [in A.C.A. § 26-75-606] to AP commissions includes the authority to purchase or own property. It is my opinion, moreover, that the authority to purchase and own property cannot be implied from the commissions' expressly-granted authority. When the legislature has intended to grant such authority, it has done so. It has done so in numerous instances. For example, it has granted the authority to purchase and own property to school districts, A.C.A. § 6-21-108; cities, A.C.A. § 14-54-401; water districts, A.C.A. § 14-116-402; soil and water conservation districts, A.C.A. § 14-125-303; regional intermodal facilities authorities, A.C.A. § 14-143-109; housing authorities, A.C.A. § 14-169-215; bridge improvement districts, A.C.A. § 14-320-120; regional airport authorities, A.C.A. § 14-362-109; and the Arkansas Science and Technology Authority, A.C.A. § 15-3-108. The authority to purchase and own property is not a power that flows from the authority to administer the advertising and promotion fund. Because it is not, and because the legislature has not expressly granted AP commissions the authority to purchase and own property, I conclude that AP commissions do not have this authority.
Although I agree with my predecessor that the Advertising and Promotion Commission Act contains no express directive authorizing an AP commission to own real property, it might be argued that it indirectly does so by authorizing the expenditure of hamburger tax funds for the "[c]onstruction, reconstruction, extension, equipment, improvement, maintenance, repair, and operation of a convention center." A.C.A. § 26-75-606(a)(1)(A)(iii). Admittedly, this statute is silent on the issue of ownership of the property.[4] It further fails to include in the catalog of permitted activities the simple "purchase" of real property to be used as a convention center. In this regard, it may further be significant that, although the Act fails to define the term "construction" as used in this statute, related legislation addressing the financing of tourism projects through municipal bonds defines the term "construct" as including "to acquire." A.C.A. § 14-170-202(6) (Repl. 1998). Notwithstanding the fact that A.C.A. §26-75-606(a)(1)(A)(iii) might possibly be read as authorizing an AP commission to own property, I do not consider that possibility sufficiently strong to retreat from my predecessor's conclusion that an AP commission is not statutorily authorized to own property.
However, I do not believe it would be appropriate to conclude that because an AP commission may not use hamburger tax revenues to buy property in its own name, it is therefore necessarily precluded from providing those revenues to the city to finance a purchase of that property in the city's name. With respect to a city's authority to purchase property of the sort at issue, A.C.A. § 14-170-205 (Repl. 1998) authorizes any Arkansas municipality or county to do the following:
 Any municipality and any county in this state is authorized to own, acquire, construct, reconstruct, extend, equip, improve, operate, maintain, sell, lease, contract concerning, or otherwise deal in or dispose of any lands, buildings, improvement, or facilities of any and every nature whatever necessary or desirable for the securing and developing of recreation, relaxation, travel, entertainment, cultural development, and other tourism activities of every nature, which are collectively referred to as "tourism," within or near the municipality or within the county including, without limitation, hotels, motels, inns, lodges, folklore facilities, cultural development facilities, convention facilities, restaurants in connection with other facilities for the securing and developing of tourism, parks, scenic roadways and walkways, transportation facilities, parking facilities, tourist information and assistance centers, recreation areas, and other facilities of any nature whatever that can be used to secure and develop tourism and to thereby stimulate and enhance the economic growth and well-being of the municipality or county and the people. Any such undertaking, or combination of these undertakings, may be referred to as a "tourism project."
(Emphasis added.) On its face, this statute authorizes a city to acquire convention-center property regardless of whether it does so directly or through a financing mechanism like a bond issue. However, although A.C.A. § 26-75-613(a)(2), which is contained within the Advertising and Promotion Commission Act, does provide the hamburger tax revenues might be pledged as collateral for bonds issued to finance a tourism project of the sort described in the above excerpt, no provision of the Code authorizes using such revenues to finance a direct purchase of tourism-project property.
In my opinion, only the legislature could clarify whether a city, with AP approval, could use hamburger tax revenues to directly purchase a building of the sort at issue in your request. However, there is no ambiguity in the Code regarding a city's right, with AP commission approval, to finance such a purchase through a bond issue collateralized by hamburger tax revenues. Specifically, the Advertising and Promotion Commission Act contemplates two distinct methods by which the proposed project might be financed by the issuance of bonds secured by hamburger tax revenues. First, the Act allows as follows for the issuance of municipal bonds under its own authority:
 Cities of the first class levying the tax and creating the commission as permitted in this subchapter are authorized to acquire sites for, construct, reconstruct, extend, equip, improve, maintain, and operate convention centers and facilities necessary for, supporting, or otherwise pertaining to, convention centers which are collectively referred to in this section as "convention center projects" in such cities and are authorized to issue bonds to provide funds for accomplishing convention center projects and to pledge all or any part of the revenues from the tax levied by the city pursuant to this subchapter to pay the principal of, interest on, and fees and expenses in connection with the bonds.
A.C.A. § 26-75-607 (Repl. 1997). Subsection 26-75-610(b) of the Code (Repl. 1997) further provides:
 The principal of and interest on all bonds issued under the authority of this subchapter shall be secured by a pledge of, and shall be payable from, all or any part of the revenues derived from the tax levied by the city pursuant to this subchapter or from all or any part of the revenues derived from the operation of the convention center project involved.[5]
As previously noted, A.C.A. § 26-75-606(b)(1)(B) declares that hamburger tax revenues "shall be used or pledged for the purposes authorized in this subsection only upon approval of the commission created pursuant to this subchapter."
The subchapter further contains a separate provision authorizing a city to proceed with the construction or acquisition of a convention center financed by other varieties of bonds. Specifically, A.C.A. §26-75-613 (Repl. 1997), which I briefly mentioned above, provides in pertinent part:
 (a)(1) Any city of the first class levying the tax and creating the commission as permitted in this subchapter is authorized to pledge all or any part of the revenues from the tax levied pursuant to this subchapter to the payment of principal of and interest on bonds issued by the city under the authority of any other law in effect, for the purpose of providing all, or part of, the funds for the acquisition, construction, reconstruction, extension, equipment, improvement, maintenance, or operation of any facility including, without limitation, auditoriums and parking facilities, which will be operated as a part of, or operated or utilized in connection with, or in support of, a convention center project.
 (2) Any municipality that has levied a tax, known as the hotel and restaurant tax [the hamburger tax], as authorized in § 26-75-602(a), may pledge all or any part of the revenues derived from the hotel and restaurant tax to the payment of principal and interest on bonds issued by the municipality under the authority of §§ 14-170-201-14-170-214 or any subsequent law and called tourism revenue bonds, or, to the extent necessary to match grant funds, in an amount at least equal to the proceeds of the bonds, to the payment of principal and interest on bonds issued by the municipality under the authority of §§ 14-186-101 and 14-186-301-14-186-312, or any subsequent law.
 (b)(1) The pledge of revenues derived from the hotel and restaurant tax shall be by the ordinance of the municipality authorizing the bonds, called the authorizing ordinance, and, in the case of tourism revenue bonds, shall be subject to the approval of the city advertising and promotion commission.[6]
Section 14-170-206 of the Code (Repl. 1998) authorizes cities and counties to finance tourism projects using "any available revenues," including those realized from the issuance of tourism revenue bonds. The subchapter provides that such bonds will be secured by "revenues derived from the tourism project," A.C.A. § 14-170-209(b) (Repl. 1998) and by a statutory mortgage lien on the financed facilities, A.C.A. § 14-170-210
(Repl. 1998) — categories of security expanded in A.C.A. §26-75-613(a)(1) to include revenue realized from hamburger taxes.[7]
However, neither the subchapter authorizing the issuance of tourism revenue bonds nor the Advertising and Promotion Commission Act appears to contemplate a direct expenditure by the city of hamburger tax revenues to purchase a building.[8] As noted above, hamburger tax revenues belong to the AP commission, not to the city, and a city may pledge such revenues only to retire bonded indebtedness of the sort previously discussed, and only then with the AP commission's approval. Such revenues are apparently not "available" to the city for any other purpose. Specifically in response to your question, then, I believe a city may indeed "buy a building with [hamburger tax] funds," but probably only if the purchase is funded in the first instance by a bond issue authorized by the voters, and only then with AP commission approval. Legislative clarification on this question appears warranted.
With respect to the question of whether the AP commission might "administer" the building — a term you have not defined in your question — I can only opine generally that an AP commission may perform any task that falls within the authorized activities outlined in A.C.A. §26-75-606. To the extent the proposed "administration" would fulfill any of the itemized purposes, it would in my estimation be authorized. However, only local counsel familiar with all of the terms of the proposed "administration" could advise whether it would accord with statutory requirements.
Finally, assuming the law and the facts support an AP commission's "administering" a facility purchased by a city using hamburger tax revenues, I am unable to opine whether that administration should proceed pursuant to a lease. I gather your question is whether if the AP commission is precluded from owning real estate outright, it might nevertheless exercise the desired control over the property through a lease arrangement with the city. Assuming an AP commission is so closely aligned with the city that created it that the commission might best be considered an arm of the city itself, it would appear to be unnecessary to effect the commission's administration through a lease arrangement. This arm-of-the-city interpretation holds a certain logical appeal inasmuch as the commission is created by the city, A.C.A. §26-75-605(a), is funded primarily by city-imposed hamburger tax revenues and functions exclusively to further the city's economic and cultural interests. See Ark. Ops. Att'y Gen. Nos. 2003-278 and 91-283 (opining that members of AP commissions are municipal officers). It further strikes me as counterintuitive to suggest that if an AP commission may pledge funds under its exclusive control as security for bonds used to purchase a facility on behalf of the city, the commission should subsequently be obliged to pay rent on the facility before it can undertake the functions that prompted the bond issue in the first place. On the other hand, it remains the case that a city and its AP commission are clearly distinct entities, and that the commission exercises exclusive control over its activities and expenditures.See Ark. Ops. Att'y Gen. Nos. 2002-239 (discussed supra) and 2000-104 (opining that a city council could never presume to define the scope of an AP commission's power or to restrict the commissioners' use of hamburger tax revenues). Moreover, an AP commission is authorized to contract in its own name with any civic group or chamber of commerce for services connected with tourism and conventions, A.C.A. §26-75-606(c)(3), and it has authority to sue and be sued in its own name, A.C.A. § 26-75-603(b)[9] — considerations that might support the conclusion that any transactions between the two entities should be contractual in nature. On balance, I suspect that an AP commission under appropriate circumstances could occupy a city-owned facility without entering into a lease. However, this question is sufficiently debatable that I am unable formally to opine one way or the other. Consultation with local counsel would appear to be warranted.
Aside from the purely legal question just discussed, factual issues exist regarding precisely what "administering" the buildings would entail. Only local counsel fully acquainted with all the details of the proposed transaction between the city and its AP commission would be situated to render advice regarding the need for or propriety of a lease arrangement. I am consequently unable to opine on this matter.
Question 2: Can a city purchase [a building] with cash from [hamburgertax] funds for use by the AP Commission as a visitors bureau? Is alease required for such arrangement?
For reasons set forth in my response to your previous question, I believe the answer to the first part of the current question is probably "no," rendering the second part of the question moot. As discussed above, I doubt that a city is authorized to conduct direct cash transactions using hamburger tax funds under any circumstances. However, legislative clarification on this issue appears warranted.
Question 3: Can a nonprofit entity purchase property with [hamburgertax] funds for a tourist promotion facility if the Commission approvesthe project?
In my opinion, assuming the transfer of funds were gratuitous, even if the transfer served a public purpose, the answer to this question would be "no." As discussed above, hamburger tax funds are public resources, and it would violate the provisions of Ark. Const. art. 12, § 5 to transfer these resources to a private entity outside the terms of a contract even if the transfer would benefit the public. See Ark. Ops. Att'y Gen. Nos. 2001-031 and 92-140 (opining that an advertising and promotion commission's grants of funds to private entities for expenditure as they see fit would violate Ark. Const. art. 12, § 5, and A.C.A. §§ 26-75-606(a)(3)(A)(iii) and (c)(1)(C)); accord Ark. Op. Att'y Gen. No. 2005-205 (opining that a municipality may never transfer public funds to a private, nonprofit corporation, no matter how exalted the motive for doing so, unless the transfer is pursuant to the terms of a valid contract). As noted in my response to your first question, an AP commission is statutorily authorized to contract with any civic group or chamber of commerce for services connected with tourism and conventions, A.C.A. § 26-75-606(c)(3), and it may further at least be authorized to enter into vendor contracts. See discussion of Cole,supra at n. 9. I am unaware of any authority in support of the proposition that an AP commission might contract with a private entity to expend hamburger tax revenues to purchase property that the AP commission would itself be precluded from purchasing using the same revenues. In my opinion, a reviewing court might well interpret such an arrangement as an impermissible straw-man transaction designed to enable an AP commission to expend hamburger tax revenues in a manner not allowed under applicable law.
Question 4: Can the AP Commission contract with a nonprofit entity topurchase a building for use as a visitors bureau?
In my opinion, "no." See response to question 3.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
[1] Although you refer to this tax by the acronym "HMR tax," it is more commonly known as the "hamburger tax." See Kyzar v. City of West Memphis, 360 Ark. 454, 455, 201 S.W.3d 923 (2005). I will use the latter designation in the text of my discussion.
[2] This conclusion has apparently not always applied. Section26-75-607 of the Advertising and Promotion Commission Act, enacted pursuant to Acts 1969, No. 123, § 3, provides that any city of the first class, apparently with or without AP approval, may initiate a convention center project and pledge hamburger tax revenues to discharge the indebtedness. This statute is still on the books. However, this provision cannot be reconciled with A.C.A. § 26-75-606(a)(2)(A), enacted pursuant to Acts 1983, No. 821, § 1, which declares that "[t]he commission is the body that determines the use of the advertising and promotion fund," and A.C.A. § 26-75-606(b)(1)(B), enacted pursuant to Acts 1977, No. 178, § 2, which declares that hamburger tax revenues "shall be used or pledged for the purposes authorized in this subsection only upon approval of the commission created pursuant to this subchapter." In my opinion, these subsequently enacted statutes clearly control, conditioning any expenditure of hamburger tax revenues, whether directly (if authorized) or indirectly to retire bonds, upon AP commission approval. See discussion, infra.
[3] See Drew Terry, AP Group Seeks Attorney General's Opinion onLease, Northwest Arkansas Times, November 14, 2006.
[4] As regards the question of ownership, it may be significant that A.C.A. § 26-75-606(a)(1)(A)(iii) authorizes the expenditure of hamburger tax revenues for the "[o]peration of tourist promotion facilities in the city or county where the city is located" only "if the city owns aninterest in the convention center or facility. . . ." (emphasis added).See also A.C.A. § 26-75-606(b)(2) (authorizing the use of hamburger tax revenues in support of a recreational facility only "if the city owns aninterest in the center or facility. . . ." (emphasis added)).
[5] Notwithstanding the fact that the Advertising and Promotion Commission Act does not call for a vote of the people to authorize a bond issue, such a vote will be required if the bonds are to be collateralized by tax revenues. Subsection 26-75-610(b) of the Code, which was enacted before the adoption of Ark. Const. amend. 65, very likely reflected a then widely held belief, consistent with Supreme Court pronouncements on the subject, that despite the provisions of Ark. Const. arts. 12, § 4 and 16, § 1, municipalities could finance public improvements without voter approval. Notwithstanding its own previous pronouncements in support of this belief, the Arkansas Supreme Court reversed itself in City of Hot Springs v. Creviston, 288 Ark. 286,705 S.W.2d 415 (1986). The court offered the following analysis:
 Despite the constitutional ban against the issuance of municipal bonds without popular approval, this court created an exception more than 50 years ago. Snodgrass v. City of Pocahontas, 189 Ark. 819, 75 S.W.2d 223 (1934). There the city, pursuant to a 1933 statute, adopted an ordinance authorizing the issuance of bonds without an election, to finance improvements to the municipally owned water works. This court approved the proposal, giving its reasons in two sentences that have been often quoted to justify the creation of additional exceptions to the constitutional prohibition:
 It was manifestly the intention of the framers of Amendment 13 to prohibit cities and towns from issuing interest-bearing evidence of indebtedness, to pay which the people would be taxed, or their property appropriated to pay the indebtedness, or any indebtedness that placed any burden on the taxpayers. It was not the intention to prohibit cities and towns from making improvements and pledging the revenue from the improvements so made alone to the payment of the indebtedness.
 The Snodgrass opinion did not explain why it was manifest that the framers of Amendment 13 [since incorporated into Amendment 62] did not really mean what they said. . . . We believe the only proper and permanent course is for us simply to give effect to the plain language of the Constitution. It states that no city or county shall ever issue interest-bearing evidences of indebtedness without the consent of the electors.
288 Ark. at 289-90. The court's ruling in Creviston led to the adoption of Amendment 65, which authorized the issuance of revenue bonds without voter approval. The court in Creviston was unequivocal in declaring a municipal-bond issue must be approved by the voters — a proposition qualified in Amendment 65 only by approving the issuance without voter approval of revenue bonds, which are secured only by revenues generated by the financed project. In my opinion, bonds additionally secured by the tax revenues authorized in the Act must be approved by the voters as well as by the AP commission.
[6] I am frankly unable to account for the inclusion in this subsection of the qualifying phrase "in the case of tourism revenue bonds," which might be read as suggesting that commission approval might not be required before pledging hamburger tax revenues as collateral for other varieties of bonds. As noted in my previous discussion, A.C.A. § 26-75-606(b)(1)(B) likewise requires AP commission approval prior to pledging hamburger tax revenues as collateral for bonds issued under the Advertising and Promotion Commission Act.
[7] To the extent that a city elects to pledge the latter form of collateral, it will need to secure the approval of the voters and of the AP commission. See n. 5, supra.
[8] Needless to say, neither subchapter would preclude a city from financing a convention center directly using otherwise available revenues.
[9] Prior to the enactment of Acts 1993, No. 364, the city, not the commission, was charged with the authority to sue for the collection of delinquent taxes. In Hot Springs Advertising Promotion Commission v.Cole, 317 Ark. 269, 878 S.W.2d 371 (1994), the Arkansas Supreme Court affirmed a trial court's dismissal of an AP commission's lawsuit seeking to collect delinquent taxes because the action was filed before the effective date of Act 364, which authorized AP commissions to file suit. The court held that whereas "[a] power in the Commission to contract with vendors may reasonably be inferred from the Advertising and Promotion Act," no power to sue could be read into the Act prior to the enactment of Act 364. Id. at 273.